1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2                    MIAMI DIVISION

3            CASE NUMBER 14-20135-CR-HUCK

4
UNITED STATES OF AMERICA,
5                                    Courtroom 13-2
             Plaintiff,
6                                    Miami, Florida
     vs.
7                                    October 29, 2014
DONNIEL LAVON KEYS and
8 KEBREYANA JAMAI JONES,

9            Defendants.

10
                  SENTENCING PROCEEDINGS
11        BEFORE THE HONORABLE PAUL C. HUCK
          SENIOR UNITED STATES DISTRICT JUDGE
12

13 APPEARANCES:

14 FOR THE PLAINTIFF:     VANESSA S. JOHANNES, AUSA
                          SETH M. SCHLESSINGER, AUSA
15                        United States Attorney's Office
                          99 Northeast 4th Street
16                        Miami, Florida 33132
                                             305.961.9023
17
   FOR DEFENDANT KEYS:    ALEXANDER J. MICHAELS, ESQ.
18                        999 Ponce De Leon Boulevard
                          Suite 750
19                        Coral Gables, Florida 33134
                                             305.324.0547
20                                      Fax:  305.285.1662

21 FOR DEFENDANT JONES:   STEWART G. ABRAMS, AFPD
                          Federal Public Defender's Office
22                        150 West Flagler Street
                          Miami, Florida 33130
23                                           305.536.6900
                                        Fax:  305.530.7120
24

25

1   **REPORTED BY:**                    **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                                        Official United States Court Reporter
2                                       Wilkie D. Ferguson Jr. US Courthouse
                                        400 North Miami Avenue - Suite 13-3
3                                       Miami, Florida  33128    305.523.5118
                                        gphofficialreporter@gmail.com
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Page

Special Agent Amanda Detterline ........................... 12

    Direct Examination by Ms. Johannes .................... 12

    Cross-Examination by Mr. Michaels ..................... 19

    Redirect Examination by Ms. Johannes ................. 29

Reporter's Certificate .................................... 79

# EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |

```
 1          (The proceedings were held in open court at 10:25 a.m.)
 2          THE COURT:  Okay.  Good morning.  We're here on the
 3   sentencings of United States of America versus Jones and also
 4   versus Keys.
 5          Counsel, may I have appearances, first for the
 6   Government?
 7          MS. JOHANNES:  Good morning, Your Honor.  Vanessa
 8   Johannes on behalf of the United States.  With me at counsel
 9   table is AUSA, Seth Schlessinger, and FBI Special Agent, Amanda
10   Detterline.
11          THE COURT:  Good morning.
12          And for Ms. Jones?
13          MR. ABRAMS:  Good morning, Judge.  Stuart Abrams,
14   Assistant Federal Defender on behalf of Kebreyana Jones who is
15   present.
16          THE COURT:  Okay.  And for Mr. Keys.
17          MR. MICHAELS:  Good morning.  Alexander Michaels for
18   Mr. Keys who's also present in front of this Honorable Court.
19   Nice to see you again, Judge.
20          THE COURT:  Good to see you.  Mr. Michaels, remember
21   that case we tried some time ago --
22          MR. MICHAELS:  Yes, sir, of course.
23          THE COURT:  -- the one that you didn't write the book
24   about?
25          MR. MICHAELS:  Of course.
```

1            THE COURT:  A friend of mine has written a book about

2    that.

3            MR. MICHAELS:  Really?

4            THE COURT:  A fictional version of it and I saw him

5    last night and he said it's coming out sometime in the near

6    future.  So as soon as it comes out, I'll let you know.

7            MR. MICHAELS:  How come I got no royalties out of this?

8            THE COURT:  You just didn't move quickly enough.  But

9    he's done a fictionalized version of it.

10            MR. MICHAELS:  I'm still thinking about it.  Maybe in

11    the next 30 years I make it.  I don't know.

12            THE COURT:  Do you know if there's a transcript of that

13    trial floating around?

14            MR. MICHAELS:  Yes, I think I know that.

15            THE COURT:  If you know, let me know.  Call my office

16    and let me know about that.  I want to provide it to the author.

17    Like I say, it's a fictionalized version, but I thought he'd be

18    interested in reading some of the transcripts of the telephone

19    intercepts.

20            MR. MICHAELS:  Yeah.  I'm going to look for them.  If I

21    find them -- thank you, Judge.

22            THE COURT:  Thank you.

23            All right.  Mr. Abrams, I know you asked for a

24    continuance for two purposes.  One was to have separate

25    sentencing, and the other was any additional objections.  My

1    understanding is you already filed the objections.  There were

2    no further objections.

3            MR. ABRAMS:  That's correct, Judge.  We're fine going

4    forward.

5            THE COURT:  All right.  Well, and the reason I want --

6    and it's my practice, unless there's some particularly strong

7    reason, to sentence both defendants or multiple defendants at

8    the same time because I find sometimes there's some finger

9    pointing and that seems to me that might be the case here.  So I

10   want to have both people here at the same time.

11           MR. ABRAMS:  Yes, sir.

12           THE COURT:  That's why I did what I did.

13           MR. ABRAMS:  Judge, just as a housekeeping matter, is

14   it possible -- Ms. Jones has requested that the hand restraints

15   be taken off.  She has prepared a statement to read to Your

16   Honor.  It would make it a little easier for her, a little more

17   comfortable for her while she's sitting.

18           THE COURT:  That's a matter for the marshals.

19           THE MARSHAL:  Judge, it's currently our policy when we

20   have more than one defendant in the courtroom, that we'd like to

21   keep them all restrained for our safety and for the attorneys.

22           THE COURT:  All right.  I think we'll follow the

23   marshal's dictates in that regard.  If there's a problem reading

24   it, you know, she can sit there or whatever.  Okay.

25           MR. ABRAMS:  Yes, sir.

```
 1          THE COURT:  All right.  Let's start with Ms. Jones.
 2   Just give me a moment.
 3          Is there any motion filed in this case by the
 4   Government?
 5          MR. SCHLESSINGER:  There is, Your Honor.  There is a
 6   motion for a downward departure pursuant to 5K1.1 based on
 7   Ms. Jones' substantial assistance.
 8          THE COURT:  Is that filed?  I didn't see it.
 9          MR. SCHLESSINGER:  It was.  It was filed last night,
10   Your Honor.
11          THE COURT:  Last night.
12          MR. SCHLESSINGER:  Your Honor, it was filed late last
13   night because there was some concern with regard to Mr. Keys as
14   to whether Mr. Keys would actually attempt to withdraw his plea,
15   and I don't think he's going to do that, but since that was
16   communicated to us that Mr. Keys had sought to do that, had that
17   been granted, the Government would not have been in a position
18   to file the 5K at that time.  So that's why it was filed last
19   night.
20          THE COURT:  All right.  In which case, maybe we should
21   start with Mr. Keys then.
22          MR. SCHLESSINGER:  That would be fine, Your Honor, yes.
23          THE COURT:  Okay.  We'll start with Mr. Keys.
24          Let me put this file aside.
25          Mr. Michaels, first of all, with regard to Mr. Keys,
```

1    did you discuss with him the Presentence Investigation Report

2    and advise him that he could file any and all objections to that

3    report?

4         MR. MICHAELS:  Yes, Your Honor.  We talk about -- and

5    there was a rather animated conversation about the PSI for a lot

6    of reason that I'll get into them a little later.

7         THE COURT:  All right.  And then there were a number of

8    objections that were filed.

9         MR. MICHAELS:  I filed several objections, Your Honor.

10   I also filed a motion for downward variance.

11        THE COURT:  I've seen that.  Let me do it one step at a

12   time.  Let me do it here.

13        MR. MICHAELS:  Sure.

14        THE COURT:  All right.  One of the objections was that

15   the original Presentence Investigation Report and the

16   calculation in that report did not take into account acceptance

17   of responsibility.  Since that time there was acceptance of

18   responsibility and the amended report gives credit for three

19   levels downward based on his acceptance.

20        MR. MICHAELS:  I have a statement, too, but since you

21   already ruled in our favor, I'm not going to bother.

22        THE COURT:  Okay.

23        MS. JOHANNES:  Your Honor, if the Government may, with

24   respect to Mr. Keys' acceptance of responsibility, I understand

25   he has filed or has given a brief statement to Probation

1    regarding an acceptance.  However, he does dispute key facts in

2    the PSI which deal with what level of acceptance of

3    responsibility he would actually be giving.  So if he's

4    withdrawing his objections to those factual allegations, then

5    the Government would have no problems with him receiving

6    acceptance of responsibility, but the facts that he's contesting

7    deal specifically with his involvement in this criminal offense.

8              MR. MICHAELS:  Well, the Government is more than

9    welcome to bring the alleged victim here and put her on the

10   stand so I can cross-examine her and find out.

11             THE COURT:  We're not going to do that.

12             MR. MICHAELS:  Well, I understand.  I'm just saying --

13             THE COURT:  Time out.  This is not a trial.  This is a

14   sentencing.

15             Does your client still maintain the objections to

16   Paragraphs 5 through 8, 11, 12, 18, 19, 20, 23, 24 and 25 of the

17   report?

18             MR. MICHAELS:  Well, Judge, yes, we agree and accept

19   responsibility for the factual proffer that we pled to, that the

20   Government indicate to us that that's what they're relying on.

21             THE COURT:  Okay.

22             MR. MICHAELS:  Yeah.

23             THE COURT:  Did the Government compare the proffer to

24   which Mr. Keys pled guilty with the allegations or the facts set

25   forth in those paragraphs I just enumerated?

1        MS. JOHANNES:  We did.

2        THE COURT:  Are they the same or are they different?

3        MS. JOHANNES:  They are different.  There are some

4  additional details in the PSI which were not in the factual

5  proffer.  And just so the Government could be heard on this,

6  Your Honor, the purpose of the factual proffer was just to

7  outset for Mr. Keys and his attorney the facts that the

8  Government would have been ready to prove at trial beyond a

9  reasonable doubt dealing with the key elements that the

10  Government has to prove.  It didn't outline every specific role

11  or act the defense --

12        THE COURT:  So what is the basis for these allegations

13  in the paragraphs I have just enumerated?

14        MS. JOHANNES:  Everything in the PSI was obtained from

15  statements made by D.S., the codefendant Jones, the evidence

16  obtained from Backpage, ADT records, Facebook records and also

17  statements made by another witness, Shara Welch (phonetic).  All

18  of that was turned over in discovery prior to the defendant

19  pleading guilty.  This was nothing that came to light after the

20  change of plea hearing.

21        THE COURT:  Okay.  And I take it that this is more

22  background information than anything else and it doesn't affect

23  the guidelines and I don't think it affects anything.

24        MS. JOHANNES:  It does affect the guidelines, Your

25  Honor.  It lists out specific instances and specific examples

1   where the defendant treated Mrs. D.S., the victim, violently.

2          MR. MICHAELS:  We dispute that fact and I don't think

3   that's legal basis for the Government to object to acceptance of

4   responsibility.  Had they been so concerned about all of this

5   and they are so outraged today and they have been for the last

6   few weeks, they should have included these facts in the proffer

7   and given me a chance to talk to my client about that and see if

8   we go forward with the plea or not.

9          My client has an absolute right, due process right to

10  rely on what they claim is the basis of the charge and he

11  accepted that and he pled to that.  And I think it's

12  disingenuous of the Government to come here today and blackmail

13  me, basically -- not me, my client -- on the objection because

14  they don't like that he denied one little fact here or one fact

15  there.

16          THE COURT:  Okay.  So you have some proffer you want to

17  make with regard to those facts, so I can make a determination?

18          MS. JOHANNES:  Your Honor, we have the case agent here.

19  The case agent did speak to all of these victims.

20          THE COURT:  All right.  Let's hear from her.

21          THE COURTROOM DEPUTY:  Please raise your right hand.

22   SPECIAL AGENT AMANDA DETTERLINE, GOVERNMENT'S WITNESS, SWORN

23          THE COURTROOM DEPUTY:  Please have a seat and state

24  your full name for the record.

25          THE WITNESS:  Thank you.  It's Amanda Detterline.

                        DIRECT EXAMINATION

BY MS. JOHANNES:

Q.  Good morning, Ms. Detterline.  Ma'am, where do you work?

A.  Good morning.  I work for the FBI.  I'm a special agent
there.

Q.  How long have you been a special agent with the FBI?

A.  Since March of 2009.

Q.  And what unit do you currently serve in?

A.  I currently work on the crimes against children squad.  We
investigate allegations or crimes involving children.  That can
include child pornography, child prostitution or the abduction
or kidnapping of children.

Q.  How long have you been part of the crimes against children
unit?

A.  For a little over two years now.

Q.  Turning your attention to this case, what was your role with
respect to this case?

A.  I'm the case agent for this investigation.

Q.  What does that mean, ma'am?

A.  That basically means that I oversee the entire
investigation.  When an allegation comes in, we have to find the
facts and the evidence to either support the allegation or
disprove the allegation.

Q.  Now, did you have an opportunity to speak to the victim in
this case, D.S.?

1  A.  I did, on several occasions.

2  Q.  Did you reach out to the victim D.S. about the sentencing

3  hearing today?

4  A.  I reached out to the minor's mother about the hearing today.

5  They both told me or the mother told me that D.S. did not wish

6  to be present today.

7  Q.  Did they state a reason?

8  A.  D.S. is fearful of the two defendants here.

9      MR. MICHAELS:  I'm going to object to this speculate

10  and double hearsay.

11      THE COURT:  She's not here and she has her reasons not

12  to be here.  That's enough.

13      MS. JOHANNES:  Okay.

14  BY MS. JOHANNES:

15  Q.  I want to talk about your prior conversations you had with

16  D.S.  Did D.S. state when she started prostituting?

17  A.  Yes, she did.

18  Q.  Can you explain to the Court when that was?

19  A.  Sure.  It was approximately the end of last year, December

20  2013 or the beginning of January 2014.  She had run away from

21  home, and she had come in contact with Ms. Keys or, I'm sorry,

22  Ms. Jones.  At that point Ms. Jones brought her back to the

23  residence on Monroe Street, and after a few days of being there,

24  she began prostituting there out of that house.

25  Q.  Who was present at the Monroe Street residence when D.S.

1  came there?

2  A.  Mr. Keys was present, Ms. Jones, as well --

3        MR. MICHAELS:  Objection, Your Honor.  Facts not in

4  evidence, confusing the dates.

5        THE COURT:  Overruled.

6        THE WITNESS:  Mr. Keys was there, Ms. Jones was there

7  as well as another adult there, Shara Welch.

8  BY MS. JOHANNES:

9  Q.  And you stated that D.S. started prostituting a few days

10  afterwards I believe.  How did that come to be?

11  A.  They were all there hanging out together.

12        MR. MICHAELS:  Judge, I'm going to have to object

13  again.  I hate to do that -- actually, I don't, but there is

14  prior prostitution by this alleged victim with Ms. Jones.  My

15  client was in State prison at the time.  She's confusing the

16  time and the dates.

17        THE COURT:  You can deal with that later on if there's

18  confusion.

19        MR. MICHAELS:  Okay.

20        THE COURT:  Go ahead.

21  BY MS. JOHANNES:

22  Q.  Focusing, Special Agent Detterline, on --

23        THE COURT:  If you would, let's just tailor it to the

24  items that are set forth in the paragraphs that I've just

25  enumerated, which are the subject of the objection --

1          MS. JOHANNES:  Yes, Your Honor.

2          THE COURT:  -- so we can move this along.

3          MS. JOHANNES:  Yes, Your Honor.

4   BY MS. JOHANNES:

5   Q.  With respect to the Monroe Street residence, what did D.S.

6   say about beginning to prostitute?

7   A.  There was an incident that occurred a couple of days after

8   she had arrived there whereby she knocked on the door that

9   Ms. Jones and Mr. Keys was in.  When she knocked, no one

10  answered.  So she opened the door and she saw them engaged in

11  sexual intercourse.  At that point, Mr. Keys was very angry and

12  upset that that had occurred.  He came out of the room and at

13  that point furnished --

14         MR. MICHAELS:  I'm going to object to hearsay.  I'm

15  going to object to hearsay, Your Honor.  Everything she relates

16  is -- I'm sorry.  I object to hearsay.  The witness, the client

17  is available.

18         THE COURT:  Okay.  I'm going to accept hearsay in this

19  case for sentencing purposes.  Go ahead.

20  BY MS. JOHANNES:

21  Q.  Special Agent Detterline, please continue.

22  A.  After the knocking on the doors, Mr. Keys came out of the

23  room.  He furnished a handgun and he talked and threatened D.S.,

24  the minor victim, telling her that basically she had

25  disrespected him, and he went ahead and hit her in the eye with

1    the handgun.

2            THE COURT:  Let me see if we can maybe -- I won't say

3    short circuit, but make it a little more concise.  Maybe if this

4    witness can just verify, if it's true, that the information set

5    forth in the paragraphs -- and I can reiterate them and list

6    them again if you'd like -- that they were provided by the

7    persons and that she is the one who obtained that information

8    and the information contained in those contested paragraphs are

9    true and accurate and she's read them to confirm that those are

10   true and accurate and she adopts those as her testimony.

11           MS. JOHANNES:  Yes, Your Honor.

12           THE COURT:  Do it that way and then Mr. Michaels can

13   ask some questions that he might want to ask.

14           MS. JOHANNES:  Yes, Your Honor.

15           THE COURT:  By the way, I think Paragraph 5, while it's

16   listed in the addendum, I don't think that's really one that

17   Mr. Keys objects to.  It has to do with the negotiations.  I

18   think it really begins in Paragraph 6.

19           Mr. Michaels, am I correct?

20           MR. MICHAELS:  Yes, sir.

21           THE COURT:  Okay.  So 5 is not really in play.  Okay.

22           MS. JOHANNES:  Your Honor, if I may, can I pass up the

23   PSI to the case agent so she can review it?

24           THE COURT:  You certainly may.

25           MS. JOHANNES:  For purposes of the record, just for

1  what the case agent is referring to, it's going to be the

2  Presentence Investigation Report of Donniel Keys, the amended

3  version at Docket Entry 92.

4  　　　　THE COURT:  Okay.  And while you're doing that, I think

5  we have the probation officer on the phone; is that correct?

6  　　　　THE PROBATION OFFICER:  Yes, Your Honor.  Good morning.

7  Shannon Culberson on behalf of the Probation Department.

8  　　　　THE COURT:  Good morning.  Thank you for joining us.

9  　　　　THE PROBATION OFFICER:  You're welcome.

10  BY MS. JOHANNES:

11  Q.  Special Agent Detterline, I want to focus your attention on

12  certain paragraphs listed in this PSI.  Please turn to

13  Paragraphs 6 through 8.

14  A.  Yes.

15  Q.  Ma'am, the information contained in Paragraphs 6 through 8,

16  did you obtain that information?

17  A.  Do you mind if I have a minute to review it?

18  Q.  Yes, please do so.

19  　　　　THE COURT:  Why don't you look at 11, 12, 18, 19, 20

20  and 23.  I think those are the ones that are in dispute.

21  　　　　MS. JOHANNES:  Yes, Your Honor.  I believe it's

22  actually 23 and 25.

23  　　　　THE WITNESS:  Okay.  Yes.

24  BY MS. JOHANNES:

25  Q.  Did you review Paragraphs 6 through 8, 11, 12, 18 through

1    20, 23 to 25?

2    A.   Yes.

3    Q.   Ma'am, the information contained in those paragraphs, is

4    that information you learned through the course of your

5    investigation?

6    A.   Yes.

7    Q.   Is that information you learned from witnesses including the

8    victim in this case?

9    A.   Yes.

10   Q.   Was that information corroborated?

11   A.   Yes.

12   Q.   How so?

13   A.   Not only did we speak with the minor victim, but we also

14   spoke with Ms. Welch and we also spoke with Ms. Jones as well as

15   subpoenaing the records and factual information from the other

16   parts.

17   Q.   Okay.  So you got records from Facebook?

18   A.   We did.

19   Q.   ADT?

20   A.   Yes.

21   Q.   And did you also get records from Backpage.com?

22   A.   Yes.

23   Q.   Okay.  The information contained in those paragraphs, ma'am,

24   have you reviewed all of the information as it's listed there

25   and do you feel comfortable adopting it as your testimony here

1   today?

2   A.  Yes, I do.

3          MS. JOHANNES:  Your Honor, would you like further

4   inquiry on the matter?

5          THE COURT:  I think that's sufficient.

6          MS. JOHANNES:  Thank you, Special Agent Detterline.

7          THE COURT:  To your recollection, is the information

8   contained in those paragraphs listed by counsel true and

9   accurate?

10          THE WITNESS:  Yes.  Yes, Your Honor.

11          THE COURT:  All right.  Thank you.

12          Mr. Michaels, do you have some questions you want to

13   ask?

14                        CROSS-EXAMINATION

15   BY MR. MICHAELS:

16   Q.  Good morning, ma'am.

17   A.  Good morning.

18   Q.  You start testifying on direct that D.S., alleged victim --

19   well, the victim because they pled guilty, I guess -- the victim

20   in this case start prostituting in January 2014.  That's

21   inaccurate, correct?

22   A.  No, that's not correct.

23   Q.  Are you aware that the victim made contact with Ms. Jones in

24   August 2014 and she start prostituting herself in August 2014?

25   You're saying that's not true?

1  A.  I am aware that D.S. did make contact with Ms. Jones in

2  August of 2013.  According to the victim, she told us that she

3  had not prostituted with Ms. Jones.

4        In Ms. Jones' debrief, she did tell us that D.S. was

5  prostituting then.  But according to the victim, she said she

6  had not, as well as the other adult witness that we had.

7  Q.  Are you adopting the PSI or you're now saying that either

8  D.S. or Ms. Jones are lying to you?  One of them must be lying

9  to you, correct?  Yes or no, ma'am.  One of them is lying?  One

10  is right, one is --

11        THE COURT:  Time-out.

12        MR. MICHAELS:  Sorry, Judge.

13        THE COURT:  Mr. Michaels, ask the question.  Don't keep

14  repeating it.

15        MR. MICHAELS:  Sorry, Judge.

16        THE COURT:  Is your point that the alleged victim,

17  D.S., was involved in prostitution before?

18        MR. MICHAELS:  It is in the PSI.  It is in evidence --

19        THE COURT:  Is that what you're saying?

20        MR. MICHAELS:  Yes.

21        THE COURT:  Okay.  Let's assume that's the case.  I can

22  adopt that.  The contention is that she previously --

23        MR. MICHAELS:  It's important because if D.S. lies to

24  the FBI agent about that, then the Court should be aware of that

25  and evaluate the credibility, especially if she's not here.

1    They rely on hearsay, double hearsay to make a case against my

2    client.

3              THE COURT:  Ask your question, but don't keep repeating

4    your question.  Don't be argumentative.

5              MR. MICHAELS:  Okay, Judge.

6    BY MR. MICHAELS:

7    Q.  So then it would be fair to say Ms. Jones lied to you, the

8    codefendant who got the 5K today, right?

9    A.  I cannot 100 percent say that.  I can tell you that that is

10   what she told us at the time and it is inconsistent with D.S.'s

11   statement.

12   Q.  Okay.  She lived with Ms. Jones alone for several months

13   till later on Ms. Jones took her back home, correct?

14   A.  I'm sorry.  Can you repeat that?

15   Q.  D.S. lived with Ms. Jones without my client being present

16   for several months between August and October 2013, correct?

17   A.  Yes, that's correct.

18   Q.  And then she went back home and then D.S. contacted

19   Ms. Jones in December, not my client, and went back to live with

20   Ms. Jones; is that correct?

21   A.  I'd have to look at the Facebook messages back and forth as

22   to who contacted who, but at some point in December, yes,

23   Ms. Jones came and picked up D.S.

24   Q.  So you agree with me, do you not, that there is no contact

25   to the Facebook between D.S. and Mr. Keys?

1  A.   That's correct.

2  Q.   Okay.   And you are aware, are you not, that Mr. Keys was

3  incarcerated in August 2013 when the first contact and the first

4  encounter took place between Ms. Jones and D.S., correct?

5  A.   Yes, I was aware that Mr. Keys was incarcerated prior to.

6  Q.   And when he come out, you were aware that he had no place,

7  he was homeless, and he has to live with Ms. Jones.   You heard

8  of that or not?

9  A.   I was aware that Mr. Keys was residing with Ms. Jones, yes.

10  Q.   Okay.   And that's because he was homeless, if you know?   If

11  you don't know, that's fine.

12  A.   Yeah, I don't know what his situation was.

13  Q.   Okay.   Would it be fair to say that when Mr. Keys comes out

14  from custody and he go to live with Ms. Jones, at the time there

15  was a prostitution ring going on?   Ms. Jones, the other lady

16  that was mentioned -- I forgot the name -- and D.S., they all

17  prostituted themselves without any help and encouragement from

18  Mr. Keys at that point, at the beginning of this relationship,

19  correct?

20  A.   Our minor victim said that she had not prostituted for

21  Ms. Jones or Ms. Welch prior to coming to the Monroe Street

22  address.   Ms. Welch also said that D.S. was not prostituting

23  prior to coming to the Monroe Street address.   However, they

24  both, Ms. Welch and Ms. Keys -- I'm sorry -- Ms. Jones, said

25  that they had prostituted prior to that.

1  Q.  Okay.  So I guess you expect Mr. Keys to be so outraged by

2  women prostituting that he should go back and live on the

3  street, right?

4          MS. JOHANNES:  Objection.

5          MR. MICHAELS:  I'll withdraw the question.

6          THE COURT:  Mr. Michaels, let me tell you right now.  I

7  do not want to have any of that kind of antics in this

8  courtroom.

9          MR. MICHAELS:  All right, Judge.

10         THE COURT:  The next time you do it, you're going to be

11 warned and be held for sanctions.

12         MR. MICHAELS:  Thank you, sir.  Sorry.

13         THE COURT:  No, don't thank me.  There's nothing to

14 thank me for.

15         Mr. Michaels, listen to me carefully.

16         MR. MICHAELS:  I understand.

17         THE COURT:  If you continue to do that, you're going to

18 be in trouble.

19         MR. MICHAELS:  I understand.

20         THE COURT:  You know you're not supposed to do that.

21 This is not TV.

22         MR. MICHAELS:  I didn't think it was.

23         THE COURT:  Okay.

24         MR. MICHAELS:  I understand.

25         THE COURT:  Continue.  Next question.

By MR. MICHAELS:

Q.   Now, you agree with me, would you not, that when you live with several people in the house, in a home, and you have intimate relationship with one occupant, you expect privacy, do you not?

MS. JOHANNES:  Objection, Your Honor.  It calls for speculation.

THE COURT:  This has nothing to do with anything.

What point are you trying to make?  Maybe we can all agree on this.  For example --

MR. MICHAELS:  The only --

THE COURT:  Time-out.  Don't interrupt me when I'm talking.  All right?

Paragraph 9 talks about Mr. Keys coming out of incarceration.  So that's in there already.  So we don't have to go over that.  This is not a trial.

If you've got some specific issues with regard to some specific facts in those paragraphs that you have enumerated, I want to hear about that.  I don't want to go through trying the whole case.  Do you understand?

MR. MICHAELS:  Yes.  Yes, sir.

BY MR. MICHAELS:

Q.   The only specific altercation or the only specific event that you testified to specific was that Mr. Key came out of his room when he was intimate with Ms. Jones because D.S. barge in

1    and that's when he hit her, right?  You testified to that?

2    A.  That's the only thing he did; is that the question?

3    Q.  The only specific instance that you testified.  You did not

4    testify to any other, and the PSI doesn't show any other

5    specific instances that Mr. Keys hit D.S.

6         Can you give me a specific date, time and circumstances

7    that allegedly my client hit D.S.?

8    A.  In Paragraph 18 of the PSI which I adopted, it says that

9    Mr. Keys hit Jones on multiple occasions and he hit D.S.

10   approximately five times during the time that she stayed at the

11   house.

12   Q.  I don't think you understood my question, with all due

13   respect.

14        I know this is a very broad, vague, general statement.

15   I am asking you, if you can, to give me a specific date, time or

16   circumstances, not in general, a specific instance where my

17   client allegedly did something violent to D.S. or Jones, a

18   specific instance.  Do you have that or not?

19   A.  Yes.  D.S. told us that she was slapped in the face by your

20   client.  She also told us that on another date and time, he took

21   a handgun and masturbated her with that handgun and pulled the

22   trigger while it was in her.

23   Q.  Who said what?  Let's tell the Court who actually initiated

24   that contact with the gun and masturbation.

25   A.  During that contact --

1    Q.  Ma'am, that's a simple answer.  A name.

2            THE COURT:  Mr. Michaels, you're going to follow my

3    rules, not the rules you think apply to you.  Okay?

4            You ask a question, you listen to the answer.  If it's

5    not the answer, it's not a complete answer, then you ask the

6    next question.  You do not interrupt the witness.

7            MR. MICHAELS:  I'm asking --

8            THE COURT:  Excuse me.  Do you understand that?

9            MR. MICHAELS:  Yes, I do.

10           THE COURT:  That's the way we play it in this Court.

11           MR. MICHAELS:  I do, sir, but I'm asking --

12           THE COURT:  No, no.  That's the way we do it in this

13   court.  You're not going to interrupt her.  If you don't like

14   the answer, you don't think it's complete, ask the next

15   question.  It's as simple as that.  That's the way everybody

16   does it in this courtroom.  You're no different.  I'm going to

17   treat you the same way everybody else gets treated.  You are not

18   going to run this courtroom, Mr. Michaels, and I want you to

19   know that right --

20           MR. MICHAELS:  All right.

21           THE COURT:  -- excuse me - right now.  And I do not

22   want you to interrupt me when I'm talking to you.

23           Next question.  Anyway, finish your answer.

24           THE WITNESS:  During that instance, Mr. Keys --

25           THE COURT:  Okay.  Time-out.  Mr. Michaels, I do not

1    want you shaking your head when you don't like my rulings.  Just

2    sit there, listen to the answer and ask your next question.

3             Finish your answer.

4             THE WITNESS:  Thank you, Your Honor.

5             During that instance, both Mr. Keys and Ms. Jones

6    walked into the room that Ms. Welch and D.S. were staying in.

7    At the time it started with Ms. Jones taking the handgun,

8    putting a condom on the handgun and masturbating Ms. Welch off.

9    At that time, Ms. Jones stated that she wasn't doing it

10   correctly, and Mr. Keys took over on the instance with

11   Ms. Welch.

12            After that occurred, Mr. Jones [sic] then took the

13   condom off, put a brand new condom on and did the same to D.S.

14   D.S. did not want that to happen.  She said she tried to keep

15   her legs closed, but they tried to open her legs and did so and

16   then masturbated her with that handgun.

17   BY MR. MICHAELS:

18   Q.  My question, with all due respect, to you is very simple.

19   Who first did that?  Can you please give me an answer, one or

20   two word answers, the name of the person who first did that to

21   either one of these two girls?

22   A.  To Ms. Welch, Ms. Jones started it.  To D.S., Mr. Keys

23   started it.

24   Q.  So you do not adopt the PSI findings that Ms. Jones start

25   doing it first to D.S., right?

1   A.  Can you point me to the sentence and paragraph that is?  Oh,

2   it's Paragraph 19.

3         THE COURT:  Paragraph 19.

4         THE WITNESS:  Yeah.  Paragraph 19, it says, "Keys and

5       Jones put a condom on the barrel of the gun and inserted

6       into Welch's vagina.  Jones did it first," and that's what I

7       stated.  "Then Keys told her she was doing it wrong and took

8       over.  Keys and Jones changed the condom.  D.S. did not want

9       to do it and D.S. kept her legs closed, but Keys and Jones

10      forced them open."

11        So yes, I do adopt what is written in the PSI in

12  Paragraph 19.

13  Q.  Paragraph 18 says that Jones did it first to Welch and then

14  they both did it.  It doesn't specify who was first or second,

15  correct?

16  A.  That's correct in that paragraph.

17  Q.  Okay.  But the initial act, the disparate act was initiated

18  and started in the day in the room by Ms. Jones, yes or no?

19  A.  Yes, they both came into the room at that time, and

20  Ms. Jones started it with Ms. Welch.

21  Q.  Thank you.

22        MR. MICHAELS:  I have no other questions, Judge.

23        THE COURT:  Thank you.  Anything further on redirect?

24        MS. JOHANNES:  Briefly, Your Honor.

25                REDIRECT EXAMINATION

1   BY MS. JOHANNES:

2   Q.   Special Agent Detterline, you were asked whether the victim

3   in this case, D.S., prostituted prior to meeting Mr. Keys at the

4   Monroe Street residence.  Do you recall that?

5   A.   Yes.

6   Q.   Okay.  You stated that both D.S. and, I believe, Shara Welch

7   stated that D.S. did not prostitute during those times where she

8   was with Ms. Jones initially.

9   A.   That's correct.

10  Q.   Did any Backpage ads surface that indicate that she did

11  prostitute during that time?

12  A.   No.

13  Q.   Okay.  And you were also asked about Mr. Keys' Facebook page

14  and whether Mr. Keys had direct contact with the victim D.S.  Do

15  you recall that?

16  A.   Mr. Keys' direct contact?  Yes, I was asked that.

17  Q.   Okay.  Did you ever locate Mr. Keys' Facebook page?

18  A.   No, I did not.

19  Q.   Thank you.

20           MS. JOHANNES:  Nothing further, Your Honor.

21           THE COURT:  Thank you, ma'am.  You may step down.

22           THE WITNESS:  Thank you.

23           THE COURT:  Okay.  Let's go to the next objection, and

24  that's on Page 2 of the second addendum regarding Paragraph 32

25  of the report.  I'll turn to that.

1        Mr. Michaels, have you seen Probation's response to

2   your client's objection?

3        MR. MICHAELS:  I saw the Government's response.  I did

4   not see --

5        THE COURT:  It's in the second addendum.  If you look

6   at Page 202 of the current version of the guidelines manual,

7   which I have, it seems pretty clear that this is an appropriate

8   enhancement for two reasons, actually.  One, that the --

9        MR. MICHAELS:  I'm sorry, Judge, which one are you

10  referring to, which objection?

11       THE COURT:  The objection that -- let's see.  You

12  object to the two-point enhancement, Paragraph 32 of the report,

13  for unduly influencing a minor to engage in prohibited sexual

14  conduct pursuant to Section 2G1.3(b)(2)(B).  Okay.  And

15  Probation's response sets forth the reasoning; one of which is

16  that there's a presumption of undue influence based upon the

17  difference in the age of the parties involved being 20 years

18  difference, that is the defendant being 20 years older than D.S.

19  and I think the probation officer's response is right on.  Plus,

20  I think the factual basis for this enhancement also shows undue

21  influence in this case.  So I think for both those reasons, I'm

22  going to overrule the objection.

23       Okay.  Let's see.  The next one is Paragraph 33, and

24  that is a two-level enhancement because the offense involved the

25  use of a computer or an interactive computer service to entice,

1  encourage, offer or solicit a person to engage in prohibited

2  sex.

3       Your objections suggest that it's not applicable

4  because Mr. Keys did not use a computer or interactive device to

5  communicate directly with the victim in this case, D.S., but

6  that's only part of it.  Again, at Page 202 of the current

7  version of the Sentencing Guidelines, it provides that in (B),

8  Subsection (B) of the 2G1.3(b)(3)(B) as opposed to (A), which

9  you're referring to, Subsection (A), that (B) applies here

10  because there was using a computer to entice others to engage in

11  prohibited sex conduct with D.S.  And so I think you've

12  overlooked the Section (B) and only looked at Section (A); and

13  Section B seems to be right on point, that others were -- so I

14  guess they're called johns, maybe they're still called johns --

15  were solicited to engage in sexual activity or conduct with D.S.

16  So I think that provision is appropriate.

17       MR. MICHAELS:  Judge, with all due respect, I don't

18  really understand that, the part of the PSI and the Government's

19  response to the Court's ruling.

20       THE COURT:  Well, do you have a copy of --

21       MR. MICHAELS:  My client never --

22       THE COURT:  Time-out.  Do you have a copy of the

23  Sentencing Guidelines in front of you?

24       MR. MICHAELS:  No, but I know what you're referring to.

25       THE COURT:  Okay.  Well, if you look at Page 22 toward

1   the top of the page under -- well, it eventually gets down to

2   3(A) and (B), and you've referred to the (A) portion of that

3   section which deals with enticing the person who in this case

4   would be D.S., but you have not considered, it appears to me,

5   Subsection B which is enticing, encouraging, offering or

6   soliciting a person to engage in prohibited sexual conduct with

7   the minor.  That's what applies here and I think it applies on

8   the facts in this case as well.

9           MR. MICHAELS:  But what I'm trying to say factually, my

10  client never used a computer or any kind of communication in any

11  way, shape or form to entice her.  When he got there, I believe

12  -- I don't want to mislead the Court.  When my client got out of

13  jail and made contact with Jones to move into her home because

14  he was homeless, she was already there.

15          THE COURT:  That's right, and he didn't entice for the

16  prior occasion, but she continued to engage in prostitution.

17          MR. MICHAELS:  But not through computer, Judge.  Not

18  through electronic -- she was already there.  They didn't need

19  to contact her.  Maybe I don't understand or maybe I'm wrong,

20  but --

21          THE COURT:  Let me ask the Government then.  What

22  evidence do you have that there was a continuation of the use of

23  a computer or other interactive device after Mr. Keys appeared

24  on the scene?

25          MS. JOHANNES:  Yes, Your Honor.  As it states in

1   Paragraph 12 of the PSI, after D.S. arrives at the Monroe Street

2   residence, he instructs Jones and Welch to take photographs of

3   D.S.   Those photographs were placed on Backpage.com.   The

4   photographs are placed on Backpage.com through the use of a

5   computer or --

6           THE COURT:   Okay.   That was my recollection, too.   I

7   just couldn't find the paragraph.

8           Yeah, I think if only (A) applied, you might be

9   correct, but the (B) section applies.   I think your objection is

10  not well-founded.

11          MR. MICHAELS:   Well, I understand the Court's ruling.

12  I think taking one photograph -- there's no evidence that he

13  placed it in a Facebook or in any other media.

14          THE COURT:   You know, my view is it's a reasonable

15  conclusion to draw that those photographs were for that purpose,

16  and while he may or may not have actually used a computer,

17  someone else at his direction obviously used them.   So I'm going

18  to overrule the objection.

19          The next objection deals with Paragraph 34.   There was

20  a two-level enhancement based on the report which says the

21  offense involved the commission of a sex act or sexual contact

22  and I'm not sure what your objection is.

23          MR. MICHAELS:   Basically, it's double-dipping at this

24  point.   That's my objection.

25          THE COURT:   Double-dipping in what respect?

1          MR. MICHAELS:  Because he's charged.  It's the charge

2     he pled to and accepted responsibility for.  It's a sex crime.

3          THE COURT:  It's a sex crime, but it doesn't require

4     the consummation of a sexual act or sexual contact.

5          MR. MICHAELS:  We deny that my client -- and the

6     Government has to prove that my client had any sexual contact

7     whatsoever with D.S.

8          THE COURT:  I don't think the Government contends that

9     he did.  I think the issue is whether the commission of the

10    crime involved the commission of a sexual act or sexual contact,

11    and clearly prostitution, I think, falls within that

12    description.

13         MR. MICHAELS:  Right.  Right, but that's what he's

14    charged with.  He's already scoring 30 on the count alone.  So

15    now the Government comes and adds two additional levels for the

16    same conduct.  That's what I call double-dipping.

17         THE COURT:  No, it's not double-dipping.  It's a

18    characteristic that might be different, and in this case is

19    different, than the general challenge.  There could be sexual

20    trafficking where there's not sexual conduct or sexual contract

21    or contact, rather, and a sexual act.  Oftentimes it does, but

22    in this case the Sentencing Guideline Commission decided that if

23    there is, in fact, sexual contact or a sexual act, that there's

24    going to be a two-level enhancement.

25         MR. MICHAELS:  I could be wrong, but my understanding

1    is that the PSI increased the guidelines by two levels because

2    they believe with no evidence that my client had intercourse at

3    least one time with D.S. and they rely on that fact to add two

4    levels and that was not proven in any way, shape or form.

5          THE COURT:  Okay.  Well, maybe I misunderstood because

6    I didn't think that was the Government's position.  I thought

7    the Government's position was because the criminal activity

8    involved sexual contact, that the two-level enhancement applied.

9    Am I incorrect?

10         MS. JOHANNES:  No, Your Honor, you're correct, and

11   that's what the Government stated in its response at Docket

12   Entry 95, Page 7.

13         THE COURT:  When did you file that, by the way?

14         MS. JOHANNES:  I filed this on Monday, Your Honor.

15         THE COURT:  Okay.  So I'm going to overrule the

16   objection.  I think you misinterpret that, Mr. Michaels.

17         Let's see.  Then the objection also dealt with

18   Paragraph 30 which was the acceptance of responsibility that was

19   done.

20         Let's see.  I see you object to Paragraph 38 which is

21   the calculation, and if I had agreed with your objections, then

22   you would be correct.  But since I overruled all the objections,

23   I think the calculation is otherwise correct.

24         Okay.  That takes us to the next objection which

25   relates to 39, Chapter 4 enhancement.  And your objection is

1   that your client is not a career offender and it does not comply

2   because there are not two crimes of violence as defined and you

3   claim that the 1998 conviction which is set forth in Paragraph

4   49 and the one set forth in 2002 which happened, which is in

5   Paragraph 54, both of those are too remote in time and I don't

6   know what legal authority you have for that proposition.

7          MR. MICHAELS:  Well, Judge, there are several issues

8   here, if I may.  Number one, the Federal statute talks about --

9   and I make an argument, as convoluted as it may be, about the

10  fact that, actually, the '98 conviction is not a violent crime.

11         THE COURT:  Let me stop you there.  That's the next

12  point we're going to get to.

13         MR. MICHAELS:  Oh, okay.

14         THE COURT:  But you make two arguments with regard to

15  1998.  One is it's not a crime of violence.  We'll deal with

16  that in a minute.  But you also say that both the 1998 crime or

17  conviction and the 2002 conviction set forth in Paragraphs 49

18  and 54 are too remote in time to qualify him as a career

19  offender.

20         MR. MICHAELS:  Right.  The Federal statute, actually,

21  and the comments mention that, that they cannot -- I mean, I

22  guess it's discretionary with the Court more than anything else.

23  I don't think it mandates the Court to find him as a career

24  criminal, and they talk about the remoteness in time, the time

25  nexus between the crime and after the crime for which he's being

1    sentenced.  '98, if my math is right, is 16 years, I believe.

2              THE COURT:  I think you're correct.

3              MR. MICHAELS:  And the other one would be like 12

4    years.  Most of my client's priors are traffic offenses, and I'm

5    not saying it's great.  I'm not asking the Court to give him a

6    metal of honor for violating the traffic laws like a hundred

7    times.

8              THE COURT:  That's a pretty good estimate.

9              MR. MICHAELS:  I'm sorry?

10             THE COURT:  That's a pretty good estimate, a hundred

11   times.

12             MR. MICHAELS:  I know, but, you know, it comes down to

13   the --

14             THE COURT:  Well, give me your best case.  Let me

15   interrupt you.  Give me your best case that says that I

16   shouldn't consider these because they're too remote in time.

17             MR. MICHAELS:  I don't know if I cite them.  You know,

18   I should have -- I'm just going to rely -- I see I don't cite

19   the case.

20             THE COURT:  I don't think there is such a case.  I

21   don't think they are too remote in time.  While there has been

22   a, you know, fairly lengthy period of time, 16 years in the

23   older conviction, given his history, his complete criminal

24   history, he's spent a lot of time incarcerated.  So I think that

25   mitigates against your argument that so much time I think that

1    the -- they are not too remote in time to qualify him as a

2    career offender.

3         MR. MICHAELS:  I do understand what the Court says, and

4    partially I have to agree with your assessment.  On the other

5    hand, you still have to focus technically on all the so-called

6    violent crimes, and that happened 16 years ago, regardless.  I

7    mean, I do understand what you're saying and, obviously, had he

8    been model citizen between '98 and today, my argument would be

9    so much stronger.  I agree.  But unfortunately, I have to deal

10   with what I got.  And I think the remoteness still should be an

11   issue, at least if you overrule the objection at this point at

12   least later on when it comes to pronounce the sentence.

13        The other issue here, Judge, is that my client insists

14   that I bring this up, and maybe this is a good point as any if

15   you allow me.

16        THE COURT:  On this objection?

17        MR. MICHAELS:  Well, partially, yes.  It has to do with

18   this objection.

19        THE COURT:  Okay.

20        MR. MICHAELS:  I got into a case very late,

21   unfortunately.  I wish I never did, but I got in the case very

22   late, and there was previous attorney who was dealing with -- a

23   previous AUSA who is present in court today, Mr. Schlessinger.

24   And there were some emails that I faxed to the Government

25   between the AUSA and the previous attorney.  And the AUSA kind

1    of implies, intimates that he doesn't believe my client to be a

2    career criminal.  And again, it's not the motion to set aside

3    the plea, but I think he has the right to rely on certain

4    representations.

5            THE COURT:  Let me stop you there because this is the

6    first time -- that's not in your objections.

7            MR. MICHAELS:  No, it's not.

8            THE COURT:  So this is the first time I'm hearing it.

9    It may be the first time the Government is hearing it.  Have you

10   discussed this with the Government before?

11           MR. MICHAELS:  Yes, I did.  It's not an objection.  I

12   don't think it's a legal objection, per se, but it's something

13   my client insists that I bring to the Court's attention.

14           THE COURT:  Fair enough.  Fair enough.

15           Is there such a letter or series of letters?

16           MS. JOHANNES:  Your Honor, my understanding -- and

17   Mr. Michaels did not send it to the prosecutors on this case

18   personally.  He sent it to another prosecutor in our office.

19   Actually, our supervisor.  There was an email between

20   Mr. Schlessinger and Mr. Encinosa, Mr. Keys' prior counsel,

21   where Mr. Schlessinger is explaining to Mr. Encinosa that he has

22   to double-check with Probation and double-check the guidelines

23   to see if Keys would be a career offender.  He can't opine

24   whether he will be or not at the time.  How Mr. Michaels got the

25   email, I don't know, but he sent it to our office, I believe,

1    yesterday or the day before and said that this was his basis of

2    believing that his client was not a career offender.  The

3    Government does not agree with him that that's what the email

4    says at all.

5            THE COURT:  It's Seth Schlessinger that's sending this

6    email or Encinosa is sending this email?

7            MR. MICHAELS:  No, AUSA Schlessinger is talking to

8    Encinosa, and it's no big deal or secret how I got it.  I call

9    Encinosa and I said, is there anything to help me?  And he send

10   me a copy of the email.

11           THE COURT:  This is the first time I --

12           MR. SCHLESSINGER:  Your Honor, I sent the email.

13           THE COURT:  Okay.

14           MR. SCHLESSINGER:  The email said to Mr. Encinosa and

15   Mr. Keys' previous attorney, it said, in effect, what I

16   understood then -- I'm not certain.  I think it said -- I think

17   it actually said, I don't believe that he would be a career

18   offender, but I cannot bind myself to that because I need to

19   research the issue more and also consider what Probation says

20   when it comes to the PSI.  So I cannot commit to any position

21   with respect to whether he's a career offender.

22           MR. MICHAELS:  That's correct.  That's basically --

23   that's correct.

24           THE COURT:  All right.  Fair enough.  I'll consider

25   that.

1          For everybody's edification, while a career criminal

2     category or designation oftentimes is a very significant issue,

3     in this case it's not so significant, because even without that

4     career criminal designation, he is a level 6 and I think

5     there's, if I'm correct, a one-level difference.  A level is a

6     level, but it's not as significant as it is in a lot of cases.

7          All right.  All right.  But before I get to the second

8     part of that, that the 1998 conviction does not qualify as a

9     crime of violence, why doesn't the crime set forth in Paragraph

10    69, kidnapping, assault with an aggravated deadly weapon,

11    aggravated battery, aggravated battery, pregnant; domestic

12    battery, strangle; battery, et cetera, et cetera, be a second

13    qualifying --

14         MS. JOHANNES:  Because, Your Honor, those were the

15    charges, but the State nol-prossed.

16         THE COURT:  Oh, I'm sorry.  It was nol-prossed, right.

17         MS. JOHANNES:  Yeah.  And he was only convicted of

18    Counts 8 and 9 which were the controlled substance charge and

19    the cannabis possession.

20         THE COURT:  And those do not qualify.

21         MS. JOHANNES:  Correct.

22         THE COURT:  All right.  So then it comes down to

23    whether the crime set forth in 49, Paragraph 49, is a crime of

24    violence.  So let's turn back to Paragraph 49, and it's abuse,

25    aggravated, great bodily harm.  And let's turn to the statute.

1  That statute is, as pointed out by Mr. Keys in his objection,

2  Florida Statute 827.03, correct, aggravated child abuse?  Page 5

3  of your objections.

4      MR. MICHAELS:  Yes.  Thank you.

5      THE COURT:  All right.  Well, I've read the statute and

6  I've read your quoting from the statute.  It appears to me, even

7  the highlighted part that you've highlighted, that that would

8  include a crime of violence.  You seem to focus on Section C,

9  "knowingly or willfully abuses a child and in doing so causes

10  great bodily harm, permanent disability or permanent

11  disfigurement to the child."  That is not emotional injury or

12  harm to the child.  That's the way I look at that statute.  It

13  seems to me if you use a categorical approach, that that statute

14  includes and only includes what your client was charged with and

15  is found guilty of.

16      But that's not so important as what the Eleventh

17  Circuit says on this very same statute.  The Eleventh Circuit

18  case of U.S. versus Wilson, which is at 392 F.3d 1243, decided

19  in 2004 that that same statute did qualify as a crime of

20  violence.  So I've got some pretty good authority for that

21  decision.  Let's see.  Judge Barkett, Judge Hull and Judge Cox

22  also agreed with that.

23      And then I had a case when I sat on the Eleventh

24  Circuit once that seemed very similar, a very similar statute,

25  the United States versus Ramirez Garcia, which is found at 646

1  Federal Reporter 3d Series beginning at Page 778, where the

2  panel also came to the same conclusion in a different but very

3  similar statute.

4      So I think it does qualify as a crime of violence in

5  the categorical approach analysis.  So I'm going to overrule

6  that objection as well.  Was that part of your memo?  Because I

7  hadn't looked at your opposition.

8      MS. JOHANNES:  It was, Your Honor.  It's on Page 8 of

9  Docket Entry 95.  We actually cite the Wilson case and the

10  Glasco case, another Eleventh Circuit case from 2007.

11      THE COURT:  I wish I had seen that because it would

12  have saved me some trouble.

13      Okay.  Let's see.  We've taken care of Paragraph 40

14  which is the acceptance of responsibility.  Paragraph 41 objects

15  to the offense level and, of course, that relates to my rulings

16  on the objections.  The same would be with regard to Paragraph

17  136 dealing with the guideline range based on his career

18  criminal category as well as the guideline calculations.

19      And finally, Mr. Michaels, you have filed a request for

20  a downward variance and you have provided a number of factors I

21  should consider including Mr. Keys' mental -- I mean, his

22  physical health issues.  And in support of that you filed some

23  records from the Jackson Health System and something called

24  Miami-Dade Investigator.  I guess that's just the authorization.

25      Anyway, I've reviewed those records and note that

1    Mr. Keys has had some issues, some issues particularly dealing

2    with his pain and suffering he goes through as a result of the

3    sickle cell disease.  And I have reviewed those and will take

4    those into consideration in considering all the factors under

5    Section 3553.

6              I've also read a letter that was submitted on his

7    behalf from Jenipher -- I guess it's Crooney or Croney.

8              MR. MICHAELS:  Right.

9              THE COURT:  And I will take that into consideration as

10   well.  And I have reviewed your sentencing memorandum and

11   request for a downward variance.

12             Have we taken care of all the objections?

13             MR. MICHAELS:  I guess the objection, yes.  I do like

14   to argue a little bit about the downward variance.

15             THE COURT:  Okay.  Let's see if we can start with the

16   first order from this point forward, and that is, based on my

17   overruling the objections, can we agree that the total offense

18   level is 34, after giving credit for acceptance of

19   responsibility, which I intend to do, and a Criminal History

20   Category of VI plus a career criminal categorization, and that

21   gives us an advisory guideline range of 262 to 327 months?  Now,

22   I'm not asking you, Mr. Michaels, to agree to my rulings on the

23   objections, but if my rulings are correct, you agree that that's

24   the appropriate guideline range?

25             MR. MICHAELS:  Yes.  We renew our objection, but yes, I

1    understand your ruling, and I agree that based on your ruling

2    over our objection, that should be the correct guidelines right

3    now.

4            THE COURT:  Okay.

5            MS. JOHANNES:  Yes, Your Honor, we agree.

6            THE COURT:  Okay.  All right.  So let me hear from the

7    Government first.  What's the Government's recommendation?

8            MS. JOHANNES:  The Government's recommendation is a

9    sentence at the high end of the guideline range of 327 months.

10   And the reasons for our recommendation are as follows:  Under

11   the factors enumerated in Section 3553(a), Your Honor, that

12   sentence is more than just, fair and appropriate here.  It's a

13   necessary sentence in this sort of case.

14           First, the offense conduct is a serious one.  Here you

15   have Mr. Keys, although he claims to play a complacent role in

16   the prostitution scheme, you have the facts showing something

17   other than that.  You have the facts showing Mr. Keys, who is 20

18   years older than a 16-year-old girl, D.S., not only taking

19   photos of her, having photos taken of her, having those photos

20   put on Backpage.com of her, but you have him being very violent

21   towards her, scaring her, intimidating her.  He, as we heard

22   from the case agent, essentially pistol-whipped her by hitting

23   her with a firearm.

24           I've handed up the two Government exhibits that the

25   Government files in support of its request for this sentence.

1    The Government Exhibit 1 deals with a victim impact statement

2    for the Court to read, and that was given to the Government

3    recently.  Government's Exhibit 2, Your Honor, is a photograph

4    of the victim, D.S., and the reason we submitted that photograph

5    is that it was taken from Facebook records and it shows D.S.'s

6    right eye black and blue.  It shows that she's been punched.

7    And D.S. indicated that that was the photograph showing her eye

8    after Keys had pistol-whipped her, had hit her in the eye with

9    the pistol.

10          In addition to that incident, you have Keys inserting,

11   along with Jones, inserting a firearm into D.S.'s --

12          THE COURT:  Okay.  We have gone through that.

13          MS. JOHANNES:  Yes.

14          THE COURT:  It's in the report.

15          MS. JOHANNES:  This all goes towards the level of

16   violence that he inserted into this prostitution scheme and that

17   he perpetuated.  It was at his causing.

18          Jones, when she had relations with D.S., according to

19   D.S. and other victims, D.S. never prostituted.  In fact, Jones

20   returned D.S. to her home, finding out she's a minor.  Jones was

21   never violent towards D.S., where Keys was.

22          In addition to that, Your Honor, you have Keys

23   implementing an ADT security system in the home.  He had it

24   installed.  Now, the security system was not installed for him

25   to see who was coming and going from the home, but it was put

1  into the bedroom.  ADT had saved, they had archived some videos

2  that we were able to recover, and those videos show exactly what

3  the victim stated, that she was forced to engage in prostitution

4  at the request of these defendants.

5       Now, in addition to the seriousness of the offense

6  conduct, we look at this defendant himself and his criminal

7  history, his background, what brings him to the table here.  And

8  Mr. Michaels is asking for a downward variance to 10 years.  By

9  20 months, he's asking for -- he's asking, excuse me, for a

10  20-year variance because the defendant allegedly has mental

11  deficiencies.  As his documents state, he has sickle cell

12  anemia, and he's had some sort of drug problem in the past.

13  Those reasons, Your Honor, in and of themselves, are not enough

14  to vary down 20 years.

15       We admit Mr. Keys, according to the medical records,

16  has sickle cell anemia.  That's not what's caused him to commit

17  these crimes and lead a crime of violence.  A lot of people have

18  sickle cell anemia and they don't lead a crime of violence --

19  they don't lead a life of violence, excuse me.

20       As far as what he has done with his life, we know --

21  and we put this in our pleading at Docket Entry 95 -- all he has

22  done is led a life of disregarding the law, hurting other

23  people, harming his children and going in and out, in and out of

24  State custody.  Since he was 17 years old -- Mr. Keys is now 37.

25  Since he was 17 years old, from as far as we have in the

1  records, all he's done year after year is come into contact with

2  law enforcement and continue to violate the law.  I know that

3  Mr. Michaels continues to say that it's mere drug infractions

4  and traffic offenses, but that's not what his criminal history

5  shows.  What his --

6        THE COURT:  I've read it.  I've read it.

7        MS. JOHANNES:  Okay.

8        THE COURT:  I think the comment was a fairly accurate

9  one about his traffic problem, but that's not all that concerns

10  me here.  There are a lot of violent crimes in there and I'm

11  aware of all those.

12        MS. JOHANNES:  Okay.  Yes, Your Honor.  I just want to

13  make the record clear that the Government's asking for a

14  sentence at the high end of the guidelines because of this

15  offense in which Mr. Keys is guilty of and because of his past.

16  He has had a fairly lenient history with the system going in and

17  out of State custody, but he's committed something very serious

18  here.  It's a serious offense and it warrants a serious sentence

19  and, frankly, if he is let out, everything from his criminal

20  history shows that he's just going to continue to lead a life of

21  violence.

22        Thank you.

23        THE COURT:  Mr. Michaels, what is your position now?

24        MR. MICHAELS:  If it please the Court, Your Honor,

25  Government:  I would like to address a few issues with regard to

1   this prosecution, and first, I would like to say that this is

2   not the kind of trafficking case that I believe the legislature

3   and State and Federal law envisioned.  There are cases where

4   young girls are kidnapped from their home countries; East

5   Europe, Asia, Africa, all other kind of places, where they get

6   here, their passport is stolen, they become slaves and they

7   become victims of human trafficking.

8        This is a political prosecution.  It's my humble

9   opinion this is a political prosecution, because lately this

10  become a hot issue in the media, the so-called trafficking.

11  We're dealing here with a girl who was 16 or 17 at the time who

12  run away from home, lives in Miami, everything happened in

13  Miami.  She did everything on her own volution.  She contacted

14  Ms. Jones -- and I'm going to get to that in a second because I

15  believe proportionality plays a big role in this sentencing or,

16  in my opinion, I suggest to the Court, the Court should look at

17  the proportionality.

18       This girl who come obviously from a bad background,

19  economical, social, education, she contacted Ms. Jones, and she

20  went on her own, meets Ms. Jones who was running a prostitution

21  house at the time.  My client at the time is nowhere close, has

22  no idea what's going on.  He has no knowledge.  It's

23  mind-boggling to me they are focusing all these efforts on one

24  month's activity that my client was allegedly involved when this

25  is going on for months and was run by codefendant who was the

1   ring leader up to the end, in reality.

2          I don't want to preach, but I think the Government is

3   better served by putting the efforts and resources into

4   socioeconomic changes and education, and that's something that

5   no one talks about.  They just want to throw the key away on

6   this guy who was mentally disabled.  He was sexually abused as a

7   child.  He had no chance in this life from day one.  He has

8   medical issues, emotional issues, mental issues, drug issues.

9   He gets out of custody and he has no place to go.  He's

10  homeless.  And somehow -- I don't know exactly how they know

11  each other, Ms. Jones and my client.  And she let's him sleep in

12  that home, and they, I guess, have a relationship or not.  It's

13  irrelevant.  I was not there.  I don't know for sure and I don't

14  care, but he's placed in a position where he gets there, he

15  actually gets refuge in a prostitution home, in a prostitution

16  organization, in a prostitution scheme run by Ms. Jones.

17         And I know maybe I'm going to put my foot in my mouth.

18  It won't be the first time, nor the last time.  It seems to me

19  there is some kind of discrimination going on because Ms. Jones

20  gets a break because she's a female, and I'm not a misogynist or

21  anything like that.  I don't want the Court to think that, but

22  the Government come like a ton of bricks on my client because

23  he's a guy.  And I don't know if -- that's how I feel, you know.

24  And again, if that's a wrong argument, it's a wrong argument.

25  She gets a lot of breaks on this case from day one and my client

1    gets none.

2           In addition to that, Judge, he has a very new

3    relationship which is very healthy with a very intelligent,

4    educated woman who lives in Tallahassee, the one who sent you

5    the letter who has a stable job, has children and she wants him

6    to come back as soon as possible.  I have spoken multiple times

7    about his life and the need -- he needs to turn it around and he

8    understands and I'm sure that he will do that.  I know it's easy

9    for me to say that because he's been in and out of the system

10   for so long, but the reality is he never get the help that he

11   needed.  All we do is put them in jail and get them out and then

12   they get in jail and then here we are today.

13          Specific facts on this case, assuming the PSI is

14   correct on most of the issues, factually, it's Ms. Jones who

15   initiated the prostitution.  It's Ms. Jones who testified about

16   my client -- I mean, that D.S. prostituting herself.  Yes, she

17   took her back home when she claimed she doesn't want to be no

18   more, but then they rekindle the contact, she went back to

19   Ms. Jones, not to my client.  D.S., once she contacted Ms. Jones

20   again to come and start prostituting for her again, she has no

21   idea that my client is in the picture.  She is not in the

22   picture.  My client lives there and takes advantage of

23   Ms. Jones' hospitality.

24          Now, there are allegations that one time he hit her.

25   Okay.  I'm not saying he's great.  I'm not saying he's good.

1    You can't hit a woman regardless whether she barge in, whether

2    she is disrespectful.  That's a fact that should not happen, and

3    I don't want to diminish the importance of the fact.  However, I

4    want the Court to understand that should be basically a battery,

5    a misdemeanor.  I'm not by any means --

6         THE COURT:  A misdemeanor?

7         MR. MICHAELS:  Yes.  In State court that will be a

8    misdemeanor.  Hitting someone in the face one time would be a

9    misdemeanor.

10        THE COURT:  A man hitting a woman in the face is a

11   misdemeanor?

12        MR. MICHAELS:  Pretty much, yes, Judge.  Well, I do a

13   lot of State work and I see thousands of cases.

14        THE COURT:  Here's what I'll say.  I agree with a lot

15   of what you say, Mr. Michaels.  For example, I agree with you

16   that Mr. Keys apparently had at least two strikes against him

17   coming into this world, and he maybe never got the help that he

18   hopefully, you know, in a perfect world would have gotten.  And

19   I don't know what to do about that.  There's nothing I can do at

20   this stage.

21        But what's concerning to me is not only this instance,

22   but other instances reflected in the report that he has a very

23   violent nature to people who are vulnerable, including a child.

24   That's a bad sign, a really bad sign.  And he has been -- as

25   both of you understand, he's been in and out of the State court

1    system, and I have some problems with that.  I think maybe

2    somewhere along the way had some State authority taken some of

3    these signs more seriously, he maybe could have gotten help.

4    The fact of the matter is he didn't and he is a violent person

5    who has shown that he strikes out violently against people who

6    are essentially defenseless and he has an extreme lack of

7    respect for other people.  And that's concerning to me and

8    that's one of the factors I have to take into consideration.

9          If I thought that he would go into prison for a few

10   months and come back out and would understand the consequences

11   of his actions and would change his life and would not be

12   violent, this would be a whole different story.  But his history

13   tells me that's not in the cards.

14         MR. MICHAELS:  Well, while I agree partially, Your

15   Honor, I do believe that he's not a bad guy and he reacts

16   sometimes.  He has a bad temper and -- well, some of them have,

17   some of them don't.  Okay.  I want to make sure that I make

18   myself clear.  I'm not condoning what he did.  I'm not asking

19   the Court to cut him a break for what he did.  I'm asking for 10

20   years hard time.  He reacted -- the only instance that I know

21   that he reacted to her barging in, he reacted wrong, he's wrong

22   on what he did, but it's not worth 30 years.  I understand his

23   sentence for something else, but we talk about the other

24   circumstances and the Government is emphasizing -- the reason I

25   am arguing this is because the Government is emphasizing this

1    particular incident as being very important.

2            THE COURT:  Well, let me put you at ease.  I agree with

3    your suggestion that I should consider proportionality, and I

4    also agree that this may not be the typical human trafficking

5    conspiracy.  And I will take that into consideration as well.

6            Does your client wish to say anything at this time?

7            MR. MICHAELS:  Judge, I have one more thing to say.  My

8    client asked me to say that, and I have an obligation to do it.

9            THE COURT:  Okay.

10           MR. MICHAELS:  During --

11           THE COURT:  Well, does your client want to say anything

12   at all?

13           MR. MICHAELS:  I'm going to ask him.

14           THE COURT:  Okay.

15           MR. MICHAELS:  But I'd like to -- I promise to take one

16   more minute of your time, Judge.  It's because my client insists

17   that I bring this point out.

18           While I was in this case rather a short period of time,

19   I acted under a lot of pressure, which is normal, I'm not

20   complaining, pressure is what I do every day -- about you need

21   to make a decision.  You plead, you go to trial.  You plead, go

22   to trial.  There was some miscommunication which I take full

23   responsibility for.  I'm not blaming the Government that there

24   was miscommunication that I was told my client is facing 10

25   years.  I misunderstood that and I related to my client as such.

 1         Now, we're not here and I'm filing a motion to set

 2  aside the plea.  I know the plea colloquy -- I mean, I'm doing

 3  this for a little while.  I understand all of this.

 4         All I am saying that as an officer of the court, I have

 5  to admit error in this case and I do that because my client

 6  insisted I do that and he's correct.  Now, I give him a choice

 7  to file a motion to set aside the plea, whether granted or not.

 8  That's what the Government is saying this morning.  He chooses

 9  not to.  He wants to get this punishment.  He's sorry for

10  everything that happened and wants to move on with his life.

11  He's not willing to go to trial.

12         But I felt obligated to tell you that.  I don't know if

13  there's any impact, if it's relevant or not to anything we do

14  here today, but he asked me and I am man enough to agree that I

15  make an error and that I don't do -- you know, I said that I'm

16  perfect.  I find out I'm not.

17         THE COURT:  Okay.  None of us are.

18         MR. MICHAELS:  So let me ask him a second if he wants

19  to --

20         THE COURT:  All right.

21         MS. JOHANNES:  Your Honor, if I may?

22         THE COURT:  Let's hear him first.

23         MR. MICHAELS:  Judge, yes, I believe he wants to make a

24  statement.

25         THE COURT:  Okay.  You can stay there.  That's fine.

1          DEFENDANT KEYS:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          DEFENDANT KEYS:  I would just like to say I fully

4   accept all responsibility of this situation and, you know, I

5   apologize to the honorable judge, you, and to my family, to

6   everyone else, the victim's family as well, Ms. Jones' family as

7   well.  You know, I just would like a fair sentencing from you,

8   Your Honorable Judge.  I was told I can't really speak really

9   what I want to speak because my lawyer insisted me not to go

10  over -- you know, I guess not to put my foot in my mouth, but I

11  apologize to everyone based on this situation of this case, this

12  incident.  And thank you.

13         THE COURT:  Okay.  Thank you.

14         Government, want to say something in response?

15         MS. JOHANNES:  Yes, Your Honor.  We just wanted to

16  inquire whether the Court, in light of what Mr. Michaels just

17  stated -- he had told his client that this would be a 10-year

18  deal, essentially -- if the Court wanted to inquire if the

19  defendant is okay proceeding and not filing a motion to

20  withdraw, just to make sure that the record is clear on that.

21         THE COURT:  That's their decision to make.  If they

22  want to file a motion, that's fine.  But that's not why I'm here

23  today.

24         MS. JOHANNES:  Okay.

25         THE COURT:  Unless I hear otherwise, there's a plea and

1  assuming that he wants to proceed with the way it is, as you

2  well know, there were no guarantees made at the change of plea.

3  　　　　Okay.  I'm going to --

4  　　　　MR. MICHAELS:  I'm sorry, Judge.  I hate to interrupt.

5  There's a family member here who wants to address the Court.

6  　　　　THE COURT:  I don't think we need that.

7  　　　　MR. MICHAELS:  Huh?

8  　　　　THE COURT:  I don't think we need that.

9  　　　　MR. MICHAELS:  Okay.

10  　　　　THE COURT:  And I need to hear from the Government and

11  from Ms. Jones because I'm going to reserve my sentencing until

12  I hear both parties.

13  　　　　Okay.  Let's turn to Ms. Jones' report.

14  　　　　Okay.  Let's see.  Mr. Abrams, have you discussed with

15  Ms. Jones the Presentence Investigation Report and advised her

16  she has the right to file objections?

17  　　　　MR. ABRAMS:  Yes, sir.

18  　　　　THE COURT:  Okay.  And there was an objection that was

19  made with regard to Paragraphs 23, 24 and 25, right?

20  　　　　MR. ABRAMS:  Yes, sir.

21  　　　　THE COURT:  Okay.  Have you tried to work this out with

22  the Government?  Have you discussed it with them?

23  　　　　MR. ABRAMS:  I have, Judge, and the information

24  contained in those photographs -- well, essentially, we agree to

25  disagree.  The information which is contained in those

1   photographs is, in fact, accurate.  However, it was provided at

2   a time that Ms. Jones was being debriefed by the Government, and

3   it was our understanding that information provided during that

4   time would not be used in the capacity against her.

5           We were concerned about the prejudicial nature of the

6   content of those paragraphs.  Your Honor has already heard about

7   this issue ad nauseam at this point.  With respect to her

8   sentence, I don't really want to keep harping on the content of

9   those paragraphs.  We would ask that it be excluded, but we

10  recognize that the Kastigar letter which Ms. Jones signed may

11  provide for it being included.

12          THE COURT:  Government's position?

13          MR. SCHLESSINGER:  Your Honor, those paragraphs are

14  properly included and should be considered.  As Agent Detterline

15  testified earlier, that information in those paragraphs came not

16  only from Ms. Jones, but actually came earlier from the minor

17  victim herself and the adult witness, Ms. Welch, which is

18  actually the only reason the agents knew to confront Ms. Jones

19  about it in the debrief.  So the information did not come from

20  the debrief or certainly not only from the debrief, but

21  originally from other sources.  So it's certainly not in

22  violation of any Kastigar agreement which I believe in any event

23  allows information obtained during debriefings to be used for

24  sentencing purposes.  For both those reasons, I think it is

25  properly included, certainly a relevant factor and should be

1    considered by the Court at sentencing.

2              THE COURT:  I agree and I'm going to overrule the

3    objection.

4              I believe that's the only objection, isn't it?

5              MR. ABRAMS:  That's correct, Judge.

6              THE COURT:  All right.  Let's see if we can agree on

7    the total offense level before consideration of any motions by

8    the Government.  I have a total offense level of 37 with a

9    Criminal History Category of I, and that would give us an

10   advisory guideline of 210 to 262 months; is that correct?

11             MR. SCHLESSINGER:  That's correct, Your Honor.

12             MR. ABRAMS:  Yes, sir.

13             THE COURT:  Okay.  The Government has a motion?

14             MR. SCHLESSINGER:  Yes, Your Honor.  The Government has

15   filed a motion pursuant to Section 5K1.1 of the guidelines, a

16   downward departure to reflect Ms. Jones' substantial assistance

17   in the prosecution of another person in this case, Mr. Keys.

18   The Government is recommending a sentence of 140 months in this

19   case representing a downward departure of 33 percent below the

20   low end of the Sentencing Guidelines.

21             The Court's already heard about the offense conduct

22   with respect to Mr. Keys.  So there's no need to go into that

23   again.  I would just confine my brief remarks to Ms. Jones'

24   assistance in this case.

25             Of course, Mr. Keys ultimately pled guilty and there

1    was no trial in the case, but Ms. Jones indicated that she would

2    testify against Mr. Keys if there had been a trial.  That fact

3    was formally communicated to Mr. Keys and his counsel before he

4    pled guilty.  Certainly, if there had been a trial, Ms. Jones'

5    testimony would have been critical because Ms. Jones was there

6    the whole time and would have been able to and would have

7    provided information regarding the treatment of D.S. at the

8    hands of Mr. Keys.  The information that she provided, although

9    there were some natural, I think, discrepancies, it was broadly

10   consistent with information that was provided by minor D.S. and

11   also the adult victim or the adult witness who was there,

12   Ms. Welch.

13         I think it's important for the Court to consider -- I

14   heard the Court mention proportionality early on.

15         Ms. Jones is differently situated from Mr. Keys in a

16   lots of ways.  Ms. Jones, apart from the fact that she pled

17   guilty and is cooperating, Mr. Keys, of course, pled guilty just

18   a few days before trial only after learning that Ms. Jones was

19   cooperating against him.  Ms. Jones was not armed like Mr. Keys

20   was.  Ms. Jones did not use a weapon to strike a victim like

21   Mr. Keys did.  Ms. Jones has a much less significant criminal

22   history.  For example, Ms. Jones does not have a prior

23   conviction for aggravated child abuse, as Mr. Keys does.

24   Ms. Jones was struck by Mr. Keys, himself, and Ms. Jones was,

25   herself, the victim of Mr. Keys' physical violence.  That was in

1    the PSI and that was adopted by Agent Detterline in her

2    testimony.  And Ms. Jones is also much younger than Mr. Keys.

3    Her role in this offense is fully subordinate to that of

4    Mr. Keys'.  So for all those reasons, I think a sentence that is

5    proportional to that of Mr. Keys' and one that reflects her

6    substantial assistance would be one which is 33 percent below

7    the low end of the guidelines or 140 months.

8           THE COURT:  Okay.  Mr. Abrams, you want to weigh in on

9    that?

10          MR. ABRAMS:  Yes, sir.  Judge, here or over there?

11          THE COURT:  Whatever makes you more comfortable.

12          MR. ABRAMS:  Yes, sir.

13          Judge, Mr. Schlessinger stole some of my thunder by

14   making some of the points with respect to the proportionality

15   issues and other things about Ms. Jones.

16          Judge, Ms. Jones was never going to trial in this case.

17   Ms. Jones, as Mr. Schlessinger set out, from the outset was

18   intent on being -- I shouldn't actually say from the outset,

19   Judge, because it's something which I talk about in my request

20   for the variance, it's really interesting -- and I've got a lot

21   of family members here, Judge, Ms. Jones' parents, in fact, and

22   her sister would like to address you.  And there are some other

23   individuals who are present as well.  So I'll keep my comments

24   rather brief so I can make way for them.

25          THE COURT:  Wait, wait.  Let me make it clear.  I read

1    a lot of letters that were submitted.  I read every one of them.

2              MR. ABRAMS:  Yes, sir.

3              THE COURT:  And I assume the people who you want to

4    make comments have written these letters, and what they're going

5    to say or what they would say today would be the same as in the

6    letters?

7              MR. ABRAMS:  Yes, sir.  Similar.

8              If I could then, Judge, just to acknowledge who some of

9    the individuals are who are present and then I'll speak as to

10   the reason for my recommendations.  Ms. Jones' mother, Acqueline

11   Jones, is present.  Mrs. Jones, could you please stand up?

12   Thank you.  Her father, James Jones.  Judge, I'd point out that

13   Mr. Jones is a retired veteran of the United States Marine

14   Corps.  Mrs. Jones is a retired property appraiser and, I

15   believe, served the county for 30 years.

16             MRS. JONES:  Yes.

17             MR. ABRAMS:  Excess of 30 years.  Her sister, Kem

18   Young, who has been a steadfast supporter of Ms. Jones during

19   this case has frequently called.  We have had many, many

20   conversations.

21             And one of the points that I'll make, Judge, is, as I

22   talk about Kebreyana Jones and the person who's before you

23   today, the Kebreyana Jones who I first met in connection with

24   this case was abrasive.  She was -- I can use other negative

25   adjectives.  And this is the person I met in magistrate court.

1    I happened to be in magistrate court the day Kebreyana Jones

2    came in and I met the Kebreyana Jones who appeared that day and

3    then I met her sister, Kem, and it caused me to wonder how these

4    two are sisters.

5              THE COURT:  You know what, it's funny you should

6    mention that because I read her letter.  I guess it's Kemyana.

7              MR. ABRAMS:  Yes, Judge.

8              THE COURT:  You refer to her as Kem.  The very thought

9    crossed my mind because they paint two very different pictures.

10   What I read in the Presentence Investigation Report about the

11   defendant is so unlike what I see in this letter from Kemyana.

12             MR. ABRAMS:  Yes, sir, which is why the significance of

13   Ms. Jones' letter in the Presentence Report is then so

14   significant because the Ms. Jones who submitted the letter

15   submitted a very intelligent, cogent, coherent, concise argument

16   or not an argument so much, but a statement to Your Honor about

17   how she felt about what she did with respect to this case,

18   recognizing D.S. as being a victim.  She understands that.

19             The significance there is that the Kebreyana Jones who

20   wrote the letter that's in the Presentence Report, Your Honor,

21   may find that the thought that went into that letter, the style,

22   the words that are used, show a similarity between what

23   Ms. Jones wrote and what her sister, Kem, wrote.

24             THE COURT:  Okay.  But, you know, there's something

25   about this letter -- I agree with you 100 percent, what you

1    said, except for one thing.  Look at the last paragraph.  And

2    she concludes, "All in all, I can say I have become cognizant of

3    the mistakes I made and the consequences of my actions."  I

4    don't know how anybody knowing what happened here -- and I know

5    a lot of people in the audience have heard bits and pieces here,

6    but I don't know how anybody could read this Presentence

7    Investigation Report and could define what Ms. Jones did and

8    what Mr. Keys did as a mistake.

9            MR. ABRAMS:  Yes, sir.

10           THE COURT:  I mean, the idea that one human being could

11   treat another human being in such an abhorrent, disrespectful,

12   mean-spirited way is beyond comprehension, but it happens.

13           MR. ABRAMS:  Yes, sir.

14           THE COURT:  And it's not a mistake.  This went over for

15   a period of time.  It was deliberate.

16           And another thing that I would have to point out, I

17   read the report, and while I appreciate the fact that the letter

18   is very impressive to the extent that you've discussed it, I

19   also note that when she was evaluated at the detention center,

20   that there was a suggestion that she has a tendency to malinger

21   a little bit.  Which Ms. Jones is the real Ms. Jones?  Is it

22   the one we have the whole history of, this abusive, abhorrent

23   behavior, perverted behavior, or is it someone who's facing

24   sentencing and wants to put her best face forward?

25           MR. ABRAMS:  Judge, I would then point out the other

1   paragraphs under mental and emotional in the Presentence Report

2   which described some of the history.

3          THE COURT:  Oh, I read that and all the problems she

4   had.  She obviously is angry and she acts out, just as you said

5   when you first met her.  She was acting out there.

6          MR. ABRAMS:  And the significance there, Judge, is that

7   Ms. Jones has had her issues.  Her parents, in describing it to

8   me, were at their wit's end at times.  Had they --

9          THE COURT:  I read all that.  I read that.  I can

10  understand it must have been very difficult.  One daughter, you

11  know, from what I can see, you know, straight line, very

12  promising life ahead of her and one always acting out.

13         MR. ABRAMS:  Yes, sir.

14         THE COURT:  Give me your bottom line, so I can get some

15  feeling for where you're going.

16         MR. ABRAMS:  Okay.  Judge, just to set that up, she

17  needs structure.  Ms. Jones thrives in structure.  When she's

18  been in the programs, the history shows that when she's in these

19  structured programs, she does well.  She takes medication.  She

20  goes to the programs.  She does what she's told to do.  She

21  becomes an extremely pleasant, lovely, young woman to talk to,

22  which is why all these people are here.  We have a lot of

23  professionals that are here in the group, Judge, in support of

24  Ms. Jones who are not family, who are not related, but are only

25  here because they know the Kebreyana Jones who is not the person

1    who is described in this report.

2          THE COURT:  But she's been acting out all her life.

3    She's been, you know, an angry, abusive person, based on the

4    report.  I mean, you appreciate that.  She obviously has some

5    issues, some emotional issues.  Maybe more than some.

6          MR. ABRAMS:  I believe --

7          THE COURT:  Where was all this help then?

8          MR. ABRAMS:  I believe these manifested themselves when

9    she was approximately 14 years old, and that was only seven

10   years before this offense happened.  And since that time, the

11   family has had Ms. Jones in approximately 18 different programs.

12         THE COURT:  But anyway, you haven't given me your

13   bottom line.  I need some idea of what you're talking about.  I

14   may agree with you or I may disagree with you.

15         MR. ABRAMS:  Yes, sir.

16         THE COURT:  Until I know that, I can't even evaluate

17   what you're saying.

18         MR. ABRAMS:  Yes, sir.  Judge, I know the Government's

19   bottom line is 140 months, which is 12 years, eight months.  I'm

20   asking for something a little more structured and it starts with

21   a commitment to the Bureau of Prisons for five years or 60

22   months.  Because that gives her -- this young woman, who is a

23   Criminal History Category I, it gives her five years, a little

24   less than five years of jail time and structure and mental

25   health treatment and guidance and counseling.  Then it's

1  followed by supervised release, and I would ask Your Honor as a

2  special condition of supervised release to place her on home

3  confinement for an additional 18 months, which would, at that

4  point, result in confinement for essentially six and a half

5  years, but that 18 months gives her structure.  It puts a

6  probation officer over her head.  It obligates her to attend

7  mental health --

8       THE COURT:  I understand all that.  I understand that.

9       MR. ABRAMS:  Yes, sir.

10      THE COURT:  I'm going to consider home confinement for

11 both the defendants.

12      Does Ms. Jones want to say anything?

13      MR. ABRAMS:  Yes, Judge.

14      DEFENDANT JONES:  Hello.  How are you?

15      THE COURT:  I'm not well.  This is a very disturbing

16 case.  If you want to know the truth, I find it very disturbing,

17 and I think I've expressed that, how two individuals can treat

18 other individuals the way you've treated this lady, this young

19 girl.

20      DEFENDANT JONES:  I would like to say, my family has

21 been fighting for me since I was a child to stay on track and do

22 the right thing, but sadly, they wanted it more for me than what

23 I wanted for myself.  But today I can finally say that I do want

24 it for myself, and I'm going to take this opportunity to fight

25 for my future.

1          Henry David Thoreau once said, "The perception of

2     beauty is a moral test."  I can relate to this because while I

3     was out committing all of my crime, all of my morals flew out

4     the window.  All of the morals that my family and my mother and

5     my father instilled in me flew out the window.  I didn't

6     acknowledge the true value of myself or my victims.  I took

7     advantage of others while someone took advantage of me.  The way

8     we carry ourselves, our actions and our behaviors all at the end

9     of the day really reflect how we truly perceive ourselves.

10          Being incarcerated I'm learning my true value and the

11    value of the ones that I've victimized, all of which I can't put

12    a price on.

13          I've learned the true meaning of dignity, of honesty

14    and integrity, all of the things that I lacked prior to coming

15    here, Your Honor.  Not a day goes by that I don't think about

16    how much my negative actions impacted innocent people.

17          As much as I wish I could take back what happened and

18    how I conducted myself, I can't.  Guilt still weighs on me.

19    However, I've done everything to the best of my ability to help

20    the situation's aftermath by cooperating with the Government in

21    my case and making necessary changes within myself to become a

22    better person and, in turn, it helps maintain some type of inner

23    peace.

24          I'm truly sorry and I'll regret the choices that I

25    made.  I was on a destructive path to death, and I know my

1  family can agree with me.  There's no justification for my

2  actions that led to my crime, and I regret how much I

3  disappointed my loved ones by my unwise decisions.

4       However, this experience has given me the strength and

5  clarity to know what I want to be and what I want to do with my

6  life.  All I can do is plead for leniency and understanding,

7  understanding of the sincerity and depth of my apology,

8  understanding of the way I've taken these past several months to

9  reflect on my mistakes and understand who I was and why I made

10 the decisions that I did.

11      As I better understand the person I am now, I'm more

12 prepared not to repeat the same mistakes that I did or the same

13 unwise choices that I chose to do and to think of the

14 consequences to myself, to the public and my family before I

15 act.

16      Your Honor, today I'm at the mercy of you and the court

17 and I'm, again, asking for leniency and understanding on behalf

18 of my family and as well as myself.  Please know that my

19 apologies are sincere and heartfelt, and I'm eager to start my

20 new life so I can use what I've learned on the inside, on the

21 outside in furthering my education, and in turn, rebuilding

22 relationships, reestablishing trust with my family and as well

23 as within the community and to be as productive and successful

24 as not only the people surrounding me, but the ones that are

25 here supporting me today.

1          THE COURT:  Okay.  Thank you.  Anything from the

2     Government in response?

3          MR. SCHLESSINGER:  Nothing further from the Government,

4     Your Honor.

5          THE COURT:  All right.  I'm going to start with

6     Mr. Keys.  I've considered the recommendations and the

7     statements of the parties.  Of course, I've reviewed the

8     Presentence Investigation Report, and we've established the

9     advisory guidelines.  I have ruled on the objections.  I have

10    considered the matters contained in that report.  I've

11    considered the statutory factors which are all set forth in

12    section -- or 18 United States Code, Section 3553(a).  I've

13    considered not only the nature of this crime and all the

14    aggravating factors involved, but also Mr. Keys' criminal

15    history.  I find that there's a substantial history of violence

16    and failure to care for others.  As a matter of fact, just the

17    opposite.

18         This particular crime I think is unfathomable, quite

19    frankly, to see -- I'm repeating myself a little bit -- but to

20    see how one human being can treat another human being this way

21    without regard to the impact on that person.

22         On the other hand, I agree with Mr. Michaels.  I think

23    there is some proportionality that needs to be considered.  I

24    think protecting society in the future is a very important

25    factor in this case.

1    While I think the guidelines are very high in this case

2    and while the crime itself is a pretty heinous, perverted crime,

3    one of violence, somehow I feel the guidelines overstate the

4    matter here.  So I'm going to go below the guidelines.  I think

5    taken all the factors, the 3553(a) factors into consideration, I

6    think lower than the guideline range is appropriate.

7    I've considered Mr. Keys' personal history and how he

8    got started in life.  I can't do anything about that.  It is

9    what it is, but I think that had a great impact on his current

10   abhorrent behavior and I think the fact that he's been in and

11   out of the State system for all these years has given him a

12   false sense of responsibility for his criminal acts and I wish I

13   could do something about that, but I don't have the -- I say

14   that time and time again.  I wish I could do something about it,

15   but I can't.

16   In any event, I also find that he's not able to pay a

17   fine.  Therefore, no fine is going to be imposed.  However,

18   apparently, there's still an issue outstanding with regard to

19   restitution.  I don't know if the Government is going to be

20   following up on that, but we'll consider that at a later date.

21   Considering all these factors, it's the judgment of the

22   Court that the defendant, Donniel Lavon Keys, is committed to

23   the Bureau of Prisons to be imprisoned for a term of 220 months.

24   It's further ordered that pursuant to 18 United States Code,

25   Section 3664(d)(5), the victims' losses are not yet ascertained

1    or ascertainable, and so I'll reserve ruling on that.  If there

2    is going to be a request for restitution, that that shall be

3    made within 90 days of the judgment.

4         Upon Mr. Keys' release from prison, he shall be placed

5    on supervised release for a term of life.  Within 72 hours of

6    his release from the custody of the Bureau of Prisons, he shall

7    report in person to the Probation Office in the district into

8    which he's released.

9         On supervised release, he shall not commit any crimes,

10   is prohibited from possessing a firearm, other dangerous device

11   or weapon and, of course, any controlled substance.  He shall

12   cooperate with the collection of DNA sample and shall comply

13   with the standard conditions of supervised release which have

14   been adopted by this Court with the following special

15   conditions:  He should comply with the mental health treatment

16   program, the substance abuse treatment program, anger control

17   and domestic violence treatment program, self-employment

18   restriction, computer possession restriction, employer computer

19   restriction and disclosure.

20        He shall have no contacts with minors, no contacts with

21   minors in his employment, no involvement with youth

22   organizations.  He shall participate in a sex offender treatment

23   program, the Adam Walsh Act search conditions and sex offender

24   registration, all as fully described and noted in Part G of the

25   Presentence Investigation Report.

1          In addition, the first 24 months of his supervised

2    release, he shall be confined to his home, shall have a

3    monitoring device so Probation will have the ability to monitor

4    his home confinement.  He shall have a monitoring device, pay

5    for the cost of that device, assuming he has the financial

6    ability to do so, and shall have in his place of residence a

7    telephone sufficient for Probation to monitor his home

8    confinement.

9          In addition, he shall immediately pay the United States

10   a special assessment of $100.  Therefore, his total sentence is

11   220 months in prison, life supervised release and $100 special

12   assessment.

13         Is there a forfeiture that's still part of this issue?

14         MS. JOHANNES:  No, Your Honor.

15         THE COURT:  Okay.  And I will reserve ruling with

16   regard to the restitution.

17         Mr. Keys, now that sentence has been imposed, do you or

18   your counsel object to the Court's findings of fact or the

19   manner in which the sentence has been pronounced here this

20   morning?

21         MR. MICHAELS:  No, sir.

22         THE COURT:  All right.  Let me tell you about your

23   right to appeal.  Has there been a waiver?

24         MS. JOHANNES:  There was no waiver of appeal, Your

25   Honor.

1          THE COURT:  Pursuant to the Rules of Criminal

2    Procedure, you have the right to appeal the sentence I've just

3    imposed.  If you desire to appeal, you must file your Notice of

4    Appeal within 14 days after the entry of judgment against you.

5    If you're unable to pay the cost of that appeal, the Government

6    will pay for your appeal.

7          Do you understand you have those rights?

8          DEFENDANT KEYS:  Yes, sir.

9          THE COURT:  Okay.  Now, with regard to Ms. Jones --

10   just one second.

11         MR. MICHAELS:  Thank you, Your Honor.  Thank you for

12   your patience with us -- with me, I mean.

13         THE COURT:  That's why they pay me the big bucks.

14         Okay.  Ms. Jones, again, I've considered the

15   recommendations and statements of the parties.  I have reviewed

16   not only the Presentence Investigation Report, but as with

17   regard to Ms. Jones, I have reviewed the letters and other

18   matters that have been submitted to the Court.  I have

19   considered the recommendations.

20         Of course, we have established the advisory guidelines

21   and I've considered the guidelines as well and I've also

22   considered the factors set forth in 18 United States Code,

23   Section 3553(a).  I feel that the sentence I'm going to impose

24   meets the goals of those factors and I think a sentence -- I'm

25   granting the motion for a downward departure based on her

1  cooperation, and I'm going to give a below-the-guidelines

2  sentence.  It also appears based on Ms. Jones' financial

3  position, that she's unable to pay a fine.  No fine will be

4  imposed.  However, as with Mr. Keys, restitution may be

5  applicable in this case, and we'll do the same thing with regard

6  to the 90 days to file any request for restitution.

7       I think one key difference between Ms. Jones and

8  Mr. Keys' case is the criminal history and Mr. Keys' history of

9  violence.  I don't see that with Ms. Jones.  She obviously has

10 some anger management issues, and hopefully, while she's

11 incarcerated, she'll have some help in that regard.  It's very

12 important in this case, and hopefully what she said here today,

13 what she said in her acceptance of responsibility, is the true

14 Ms. Jones.  I don't know one way or the other, quite frankly,

15 because it's inconsistent with the history to this point, but

16 we'll just keep our fingers crossed and hope for the best.

17      In any event, it's the judgment of the Court that the

18 defendant, Kebreyana Jamai Jones, is committed to the Bureau of

19 Prisons to be imprisoned for a term of 100 months as to Count 1.

20 It's further ordered that pursuant to 18 United States Code,

21 Section 3664(d)(5) that since the victims' losses are not yet

22 ascertainable, I'll set a date 90 days from now for the

23 Government to file any request for restitution.

24      Upon her release from imprisonment, Ms. Jones shall be

25 placed on supervised release for a term of 25 years.  Within 72

1   hours of her release from the custody of the Bureau of Prisons,

2   she shall report in person to the Probation Office in the

3   district into which she's released.  And while she's on

4   supervised release, she shall not commit any crimes, is

5   prohibited from possessing a firearm or other dangerous device

6   or weapon and, of course, any controlled substance.  She shall

7   cooperate with the collection of her DNA sample and shall also

8   comply with the standard conditions of supervised release which

9   have been adopted by this Court with the following special

10   conditions:  She shall comply with mental health treatment,

11   substance abuse treatment, self-employment restriction, the

12   computer possession restriction, the employer computer

13   restriction disclosure, no contact with minors restriction, no

14   contact with minors in her employment, no involvement with youth

15   organizations, sex offender treatment program requirements, the

16   Adam Walsh Act search condition and the sex offender

17   registration, all as described in detail and noted in Part G of

18   the Presentence Investigation Report.

19        In addition, for the first 24 months of her supervised

20   release, Ms. Jones shall be confined to her home, shall wear a

21   monitoring device and she shall pay for that device to the

22   extent she's capable of doing so.  She shall have at her place

23   of residence a telephone sufficient for Probation to monitor her

24   home confinement.  She's also required to pay immediately to the

25   United States a special assessment of $100.  Therefore, the

1  total sentence is 100 months in prison, 25 years of supervised

2  release and $100 special assessment.

3          Ms. Jones, now that sentence has been imposed, do you

4  or your counsel object to the Court's findings of fact or the

5  manner in which sentence has been pronounced here this

6  afternoon?

7          MR. ABRAMS:  This isn't an objection, Judge, but could

8  we have a recommendation of participation in the Bureau of

9  Prisons 500 hours substance abuse program during the term of

10 incarceration?

11         THE COURT:  I'll make that recommendation.

12         MR. ABRAMS:  And may we also have a recommendation of

13 FCI Coleman as the facility?

14         THE COURT:  No, I don't recommend it.  I'll recommend a

15 place that is appropriate based on the availability as close to

16 South Florida as possible.  And if Mr. Keys would like the same

17 recommendation, I'll make that as well.

18         MR. MICHAELS:  Yes, Judge, he would like a

19 recommendation close to Tallahassee.  Whatever --

20         THE COURT:  Okay.  Closest to Tallahassee.

21         How about the drug treatment program?

22         MR. MICHAELS:  Yes, Judge, he would like that.

23         THE COURT:  I'll make that recommendation as well.

24         MR. ABRAMS:  Judge, may ours reflect Tallahassee as

25 well?  Ms. Jones told me she was interested in FCI Tallahassee.

1          THE COURT:  As close to a facility in Tallahassee,

2    Florida.

3          MR. ABRAMS:  Yes, sir.

4          THE COURT:  Any objection?  The question was, do you

5    have any objections?

6          MR. ABRAMS:  Oh, I'm sorry.  No, Judge.

7          THE COURT:  All right.  Ms. Jones, let me tell you

8    about your right to appeal.  Pursuant to the Rules of Criminal

9    Procedure, you have the right to appeal the sentence I've just

10   imposed.  If it's your desire to appeal, you must file that

11   Notice of Appeal within 14 days after the entry of judgment

12   against you.  And if you're unable to pay the cost of that

13   appeal, the Government will pay for your appeal.

14          Do you understand you have those rights?

15          DEFENDANT JONES:  Yes, sir.

16          THE COURT:  Do you understand you have those rights?

17          DEFENDANT JONES:  Yes, sir.

18          THE COURT:  Anything else at this time?

19          MS. JOHANNES:  Your Honor, the Government moves to

20   dismiss Counts 2 and 3 with respect to Ms. Jones.

21          THE COURT:  Okay.  Anything else?

22          MS. JOHANNES:  No.

23          THE COURT:  It will be dismissed then.

24          MS. JOHANNES:  Nothing else from the Government.

25          THE COURT:  Anything else from any of the defendants?

```
 1              MR. ABRAMS:  No, sir.

 2              MR. MICHAELS:  No, Judge.

 3              THE COURT:  Thank you all.

 4              MR. ABRAMS:  Thank you, Your Honor.

 5              MR. MICHAELS:  Thank you.

 6         (The hearing was concluded at 12:16 p.m.)

 7

 8                  C E R T I F I C A T E

 9         I hereby certify that the foregoing is an accurate

10    transcription of proceedings in the above-entitled matter.

11

12    ___01-03-15_____      _____
          DATE                GILDA PASTOR-HERNANDEZ, RPR, FPR
13                            Official United States Court Reporter
                              Wilkie D. Ferguson Jr. U.S. Courthouse
14                            400 North Miami Avenue, Suite 13-3
                              Miami, Florida  33128    305.523.5118
15                            gphofficialreporter@gmail.com

16

17

18

19

20

21

22

23

24

25
```